4-0, 43-91, Kamela Murphy v. Ohio St University 4-0, we're going to get back to you in just a minute. First side, we're going to close. We'll be right back. You're not going to hire from Ohio State. You're going to hire from the home of Ohio, Solicitor General's office, and that was Ohio State. Our loss, their gain, I would say. You may proceed. Fine, you may proceed. Excuse me, Your Honor. My red light is currently on. It will start up the minute you start talking. Very good. If it pleases the court, counsel, and all others present, this case is about whether or not paying Ms. Pamela Murphy as a police dispatcher a different wage than a male dispatcher violates the Federal Equal Pay Act, even if there is a collective bargaining agreement. A truncated version of the undisputed facts is that Pamela Murphy worked part-time for two municipalities, Grandview Heights and Upper Arlington, both of whom have mutual aid with Ohio State University for emergency response. She also was employed part-time by the Ohio State University Police Department as a dispatcher while continuing to work part-time for both Upper Arlington and Grandview. Upper Arlington and Grandview, in response to requests for aid from OSU, respond, and she knows that process. Is there any argument here that the basis for the differential was experience? The argument is by the appellee that experience... I'm talking about you. Is there any dispute on your client's part that the reason that they've advanced is experience? No. Is there any dispute about whether experience is a factor other than sex? No. So in order to get around that, you then argue, as I understand it, that they really should have used other factors that presumably would be beneficial to your client as opposed to just experience, right? No. That's not your argument? No. Okay. What did I miss? My argument is that as they have defined experience, which is not defined in the collective bargaining agreement, but as the Director of Human Resources defined it, is that it is merely time on the clock, and it involves no analysis of the prior performance of any particular duties whatsoever. In other words, it is an assignment of a... I got that, and you're right. I forgot that. So when they say experience and they interpret it to mean just time on the clock, that's what they did, right? Correct. So what is your authority that says that they can't define experience that way and fall within one of the exceptions to the Equal Pay Act requirements? Well, I think EEOC v. J.C. Penney says that there has to be some... just merely a verbalization of a reason. There has to be some legitimate business reason. In my inquiry into Director Hunter's... So there has to be a legitimate business reason to define experience the way they define it, or there has to be a legitimate business reason, which in this case is experience? The latter, Your Honor. Well, they've come forward with a legitimate business reason. That's experience. So what's your authority that says that they have to define it the way your client would prefer they defined it? Well, they've articulated experience. And experience, in order to differentiate justification and pay, has to mean something. It is not a bare word. It is not a word in a vacuum. Therefore, inquiry into what experience... what do they mean by experience and what do they consider as part of a legitimate business reason is certainly fair game in terms of, number one... So it's not a legitimate business reason to define experience, as it seems to me the word would logically be defined, as the amount of time that you've done the job. Correct. That's not legitimate. Do we have any case that says that? No. For the purpose of seniority, under the collective bargaining agreement, the definition of experience does not exist. The collective bargaining agreement for the dispatchers includes no seniority wage other than for the first three years of employment, in which case it is a 50-cent step. After that, all collective bargaining unit compensation is paid on the basis of merit, performance, or benefits and is not dependent upon any seniority or experience whatsoever within the division. Therefore, when you look at what the employer is saying is experience, you have to look at whether or not, as we've argued Title VII at EPA, number one, under Title VII we can argue whether or not their reason is pretext. So, in other words, because they have one criteria they use after three years and a different criteria during essentially the probationary period, that then is evidence of pretext? It is evidence that... So you can't have different conditions in a probationary period or that's going to be then evidence of pretext, is that it? No, Your Honor. You can have different conditions during a probationary period. In fact, it's quite common to have conditions in a probationary period. What is uncommon about this particular case, and it does not appear anywhere in the briefing, but for the most part, probationary periods in a three-year period for advancing in wages is common among law enforcement agencies and dispatchers. What we are looking at here is whether or not the particular issue involved is experience from a standpoint that it supports the difference in pay, and here it doesn't. Why? Because there is nothing in the collective bargaining agreement after the first three years which credits people for experience. They get the experience when they're with the university, but after that there is no experience. Let me ask you what I hope will be one other question that I'll try to resist. Oh, I don't do very well at that. It seems to me that if you're right, and that they can't define experience the way they defined it, and that they have to take all of these other things into account, culture, geographic exposure, so on and so forth, that actually increases the chances of pay disparities based upon sex because you've turned it then into such a subjective measure that how could that ever be what any government agency was seeking? Or put another way, if they were required to take into account all of those factors that you've just set forth, ignoring the fact that you've cleverly set them forth because you think they favor your particular client, how would then anybody like a court ever weigh whether they've actually applied this long laundry list of factors fairly absent a consideration of sex? Well, the laundry list, as you put it, Your Honor, was not asked for the purposes of favoring my client because as we would see in the case that was decided here in this court, in Beck versus Wilson, or correction, Beck-Wilson versus Principi, that comparing the jobs held by the female and male employees and by showing that those jobs are substantially equal, not comparing the skills and qualifications, establish a prima facie case. What I was doing in making those inquiries of Director Hunter was to see and to narrow down what the definition of experience was that he used at his discretion to hire Matthew Robbins at the highest salary they'd ever paid a dispatcher. And in answering those questions, arriving at the final statement as to whether or not experience under Title VII is pretext or at least looking at whether or the jobs are the same or not, the final question I think that cements all of this is under the circumstances if Mr. Robbins would have come in as a part-timer, now Mr. Robbins had nine years experience, one year downtime as a Marion County rural dispatcher for the Sheriff's Department. As a matter of record, how would you have assessed him in terms of determining his starting pay? What would that have been? And the reply was he would have gone through the same process. Again, with his experience, we probably would have brought him in just a little bit lower than whatever the lowest paid full-timer was. In other words, there's an entire inconsistency here as to what his experience is based on the interpretation of Mr. Hunter, arbitrary and capricious, based on whether or not he is titled a full-timer or titled a part-timer. Was there a rationale then given for paying Robbins what he was paid? The rationale was his experience. And again, going back through that complete inquiry as to what constitutes experience, it finally boiled down to this. There was nothing else that was shown other than, and I believe I actually asked the question, in other words, just time on the clock. Yes, that's the only thing that we considered. And in that case, what you end up doing is that we have a situation where the Equal Pay Act, in its design, in its purpose, is really supposed to cure those differences in pay for the same job. You can tell I couldn't control myself very long here. Isn't time on the job the least discriminatory way that you can do it? As far as taking out age, race, sex, national origin, anything else? If you are looking solely at time on a job. How about looking solely at not getting sued? I'm sorry, Your Honor, you lost me there. Sure, I interrupted you. Isn't using only time on the job the least possible discriminatory way that you could do it? No. The least possible discriminatory way that you could do it would be that everybody that came in the door with that particular employer would be treated with regard to the experience with that employer at that job position. So you could start everybody out who's starting out as a dispatcher at the exact same pay rate. I see no reason why you could not. Under this collective bargaining agreement even. In fact, that is the rule. That's the norm. The exception is at the discretion of the director that a higher wage can be paid. That discretion is based on his definition of experience. Experience, as I believe I indicated this in one of the briefs that I submitted, either my merit or reply, is that who's most likely in coming out of a part-time environment, what's the class of persons most likely coming out of a part-time environment? Most likely in today's world, it is a female. So for that reason, it has a disparate impact if the way it's interpreted here. Are you making a disparate impact claim here? No. I'm just raising the issue because I was asked a question leading to that direction. Thank you. Good morning. Christina Correll on behalf of The Ohio State University. So let me start out by kind of piggybacking on a point that Judge McKeegan made, and that is the fact that we have in this case, which is kind of unusual for an employment lawyer like me, we have in this case a provision in an employment contract, a collective bargaining agreement, that for once actually is completely objective. We that work in the employment area don't often have cases where I'm standing in front of you talking about the fact that the term in the contract really is not open to interpretation by anyone. The other issue that we typically don't have in cases that we have in this case is the fact that this is a negotiated term in a collective bargaining agreement, and really you don't have to take Ohio State's word for the interpretation of the contract because the Fraternal Order of Police agrees with us. So the employee union agrees that the definition of experience in the contract is actual experience working as a public safety dispatcher. Well, suppose that because of historic reasons meant, or because of discrimination by other entities, not by Ohio State, meant that there were virtually no women who had ever been prior dispatchers, and therefore women were going to be getting lower salaries based on this objective factor in your CBA, but because of the historic treatment of women, how would you address that? Well, your hypothetical would be absolutely correct. If there was actually evidence in this case that that was true, then your hypothetical could potentially create a disparate impact argument. Unfortunately, for the purposes of this case, there was no disparate impact argument made. There was no evidence put forth at the trial court level that this actually did have a disparate impact on women. As a matter of fact, I wanted to make sure that I brought the list of dispatchers from Ohio State, and out of half of the dispatchers at Ohio State are women. So we just don't see... Do we know, is there record evidence, as to whether the women started at lower salaries than the men? Well, yeah, there is evidence in the record, and this is the evidence. The evidence is there's no evidence. Some women started at a higher salary than she did. Some women started at a lower salary than Pamela Murphy did. Some men started at a higher salary than Pamela Murphy did, and some men started at a lower salary than Pamela Murphy did. So when you're talking about evidence that could potentially form a case for disparate impact, there just isn't any evidence, because it's evenly spread across the board. The salaries are evenly spread across the board. And you know, quite frankly, as I stated before, this is just one of those cases where you want to attract, as an employer, competent, experienced employees. So it certainly makes sense from a business reason to pay experienced employees more than those that not only have no experience, but that you have to train. So when you're an employer and you're thinking about, okay, how do we attract candidates? How do we, as Judge McKeague stated, how do we make sure we don't get sued? You know, I almost can't think of a less objectionable method by which to measure incoming employees than, how much experience have you actually had doing this job? So for purposes of... Well, you could say, apart from the being sued aspect, you could say that there are factors that weigh in more than time on the clock, more than years on a job. So if you're a dispatcher at a teeny tiny place versus New York City, maybe two years in New York City is worth four years in a teeny tiny town. True, but in this case, remember who we have making the decisions. The Fraternal Order of Police is the largest law enforcement organization in the United States. Last I checked, they had 322,000 members in the United States and tout themselves as being the premier organization that understands law enforcement. So when the FOP comes in and says to Ohio State Public Safety, we think that this is a good measure by which to measure employees that are coming in. Because they're rewarding their own. They could be rewarding their own, and you know, that's actually a very good point. Thank you. And it kind of dovetails into this question about part-time employees that was brought up. Part-time employees, the reason part-time employees are paid differently is because they're not a member of the union. It's very simple. If they're not a member of the union as part-timers, they don't get the benefit of the negotiated starting wage. So, you know, I think your question is a good one. Could the effect of the provision be to help FOP members ultimately? It might be. But I tell you what it doesn't do, it doesn't discriminate on the basis of sex. Counsel, I'm sorry, go ahead. Go ahead. Counsel, if I may, with regard to the FMLA retaliation claim. Yes, sir. The plaintiff makes a great deal, as you know, of the investigation that was conducted with regard to the parking incident on game day, apparently. What is your response in terms of the harmlessness or the lack of a problem from your client's standpoint with regard to the delays that were conducted in the investigation surrounding that incident? Well, this is our problem. You know, it's kind of damned if you do and damned if you don't. When we get this information and we find out that she has been charged by the Columbus Police Department, which is not affiliated with Ohio State Public Safety, we next find out that she's going out on FMLA leave. So what do we do? What do you do? Do you call her at home on her FMLA leave and say, hey, we're going to be investigating this and we're sorry that you're on leave, but we're going to investigate this and keep in mind this happened in the fall. Why not approach her as a safer, more delicate way to go to a union representative, for example? Well, we could have. We could have. I think that our representative that was deposed in this case admitted that. He said, you're right. I could have done that. I could have done that. And we thought about that. But we thought it best. And the lapse in time, remember, this is an investigation that's being handled by another police agency. So it's all documented by the other police agency. They've got witness statements. They have police reports filled out. This certainly isn't any longer time in between, say, a criminal being apprehended and proceeding to a criminal trial. I mean, if you look at it that way. This happens in the fall. She goes out on FMLA leave. The investigation commenced on January 9th, you know, within weeks of her returning. So let's just say for the sake of argument that it's three months in between the time of the actual incident and the investigation starting up. You know, there's just no evidence. There weren't any witnesses that said, you know, I just don't remember what happened. But isn't it possible that had she been aware, had the union been aware on her behalf earlier, certainly you'd agree that witness recollection is fresher, closer in time to the incident than, say, perhaps as long as two or three months later during that period of time. Wasn't she deprived of that opportunity as a result of the delay in being informed that such an investigation was being undertaken? I think to answer your question, I think that there is a possibility that that could have happened, but there's no evidence that that actually did happen. She points specifically to some evidence or some problems with things, information that could have been gathered and so forth that are done. There are several things that she raises in her brief. Are those, would you care to address those at all? I actually don't know what you're referring to. You know, there was no evidence from my perspective that was put forth that the delay in this investigation had any effect on the ultimate outcome. And in addition, really, the next question you need to ask then is, was the delay for a legitimate business reason or a legitimate reason period, or was the delay to punish her in some fashion for taking FMLA leave? You know, maybe our guy was wrong, maybe he was right. I don't know. But, you know, I don't think there's any evidence that he's making decisions with the purpose or intent of retaliating against this poor lady because she's out on FMLA leave. So, you know, even if you say, hey, you know what, guys, you made a stupid decision, you still don't get to that next step of having at least some evidence that the reason given was some sort of pretext. Am I right that there was an arbitration in this case involving some matters? Yes. And what is the status of that? Should we know the status? Should we take into account the status? I've taken the position the Ms. Murphy's counsel filed with this court the arbitration findings. Right, and we have not ruled. I filed a motion to strike it. Right, we have not ruled on that, so that's why I'm asking you. In my opinion, that filing is an improper attempt to supplement the record on appeal. And really, whether an arbitrator interpreting the terms of a collective bargaining agreement decided the issue of cause or not just cause for discipline, I don't think has any relationship to a claim for FMLA retaliation. Having read the arbitration decision, I will tell you that it has nothing to do with any decision involving federal employment statutes. It has to do with the interpretation of the term just cause and a collective bargaining agreement, and I just don't think it has any relevance here. And based on timing, this was not record evidence in the district court? That's correct. It came out after the district court had already ruled. To refresh my recollection, under the retaliation clause, is this a reason or is this a but-for test that we apply? This is a but-for test. So you really have to rule out any of these other what you claim to be legitimate business reasons why you did what you did and say all of this happened because they were mad at her? Yeah, I mean, you have to demonstrate there has to actually be evidence. It's not just that you can demonstrate that the reason given was a pretext. There's an additional burden that's imposed on the appellant in this case, and that is not only that the reason was a pretext, but also that the real reason was this anti-FMLA animus or discrimination. And I don't think there's any, first of all, any evidence that this is pretext. You know, we can debate all day long whether you should do something while she's on FMLA leave or wait until she gets back. I mean, you know, we could debate that all day long, and quite frankly, had they called me and asked me that question before they made the decision, I'm not sure what I would have told them. But the reality is that there is just no evidence of pretext, and there's no evidence that any action was taken in this case in retaliation for her taking FMLA leave. As a matter of fact, the evidence is that she went out on her leave, she came back, and she still works for us. And quite frankly, she does a great job for us. So, you know, in this case, I just want to point out to the Court that I believe there were more claims made than actually survive. I think I'm, I believe I understand that the ADEA claim has been waived. There is no longer a claim for retaliation based upon her 2009 EEOC filing, and I don't believe there's any remaining claim for FMLA interference. So unless the panel has any further questions, I thank you for your time. And I'll conclude. Thank you. To address a few issues, perhaps if I were thinking about it again, maybe I would have sued the FOP for their part in making this contract, but that's beyond the scope here. I guess I would put it to you this way. I asked this question in deposition. I'd like you to explain to me in some fashion how Ms. Murphy is prejudiced by an investigation that doesn't start immediately with regard to the witnesses who may provide information that is exculpatory for her, and those witnesses who have to wait for four months before they give information, which now that information not only may the exculpatory information have changed, but their memories may have failed with regard to the entire incident. How is she benefited by that? And the answer was at that time, damned if you do, damned if you don't situation. Is there any underlying dispute here, ignoring what the employment consequences are, that she tries to get to a parking lot, it's blocked by the police, she drives over the curb and around the barrier and disregards an order to stop? Are those fundamental questions disputed here? No. So what on earth difference does it make whether there were other witnesses, other unidentified, unknown witnesses, or whether somebody's recollection was refreshed earlier or later, in terms of the basis of Ohio State or the police department, whoever it was, having conducted the investigation? Because she was also charged with regard to her conduct in the presence of the officer and the way that she responded to the officer. All right, let me expand it and ask you about that. At its core, was she not told to stop after she parked her car and she got out of her car and said, I've got to go to work, and she left? Correct. So there's no dispute about that? No dispute about that. So the consequences that flow from that are obviously disputed, particularly with respect to her employment, but what actually happened is not in dispute at all, is it? No. So what on earth then is the basis of the claim that it must have been pretext because they waited until she came back to work, as opposed to investigating it while she's home sick? Because they had talked to people about the information. There was a mitigating circumstance that they had blocked her entrance to her paid-for parking place and had not informed any CPD officers that she was the only dispatcher that was going to be coming in for that particular afternoon shift during an OSU ball game. There's no dispute about any of that, is there? The entrance was blocked. She's a dispatcher. That was her spot. She had to go to work. Nobody disputes that, do they? No, but she has a duty to be there on time. They knew she was there. And to heck with what the police say. And to heck with what the police say. She works in a quasi-law environment and she can just simply disregard the police. No, she can't disregard the law. But at some point, her duty to report to work for the safety of OSU, their police department, and the people that they protect outweighs driving around a just partially blocked street. But that has nothing to do with what happened. That's just her reasoning and the consequences, correct? And she was charged with basically conduct unbecoming insubordination with regard to her interaction with that officer and under those circumstances. And that's why I submitted. She's charged by the Columbus police, right? The Columbus police charged her with disregarding the orders of an officer. She was found not guilty on that. She went to trial, found not guilty. And then the arbitrator decided that that warranted a written warning for that information. Nobody talked to the officer. Nobody asked the officer what actually had happened. When I say there's no dispute, there's no dispute as to the facts that were presently presented by the officer but not those facts that we ultimately may have found out from a proper investigation. When was she found not guilty on the Columbus police charge? Was that before her FMLA leave ended or after? That was after her FMLA leave ended. So that proceeding went on afterwards? Yes, and it ended up in the arbitration. Counsel, if I may, is there any dispute about her direction to the Columbus police officer to speak with her superior officer or fellow officer who was present by way of explanation of her need to get to the parking lot? Wasn't that another fact that you included or that was important? Is there any dispute about that? No, she's walking. She acknowledges the presence of the officer. Bottom line, there's simply no factual dispute about what happened, right? What she did, why she did it, and the consequences were in question. But what happened is not in dispute. Ohio State doesn't claim that she did something or the police department don't claim that she did something that she denies doing. She doesn't say they did something that they deny doing. Everybody agrees on what happened. It's the question of why she did it and the consequences that flow from that. Is that a correct statement? No. Okay, why is it wrong? It's wrong because the facts that were laid down at the time they occurred, as interpreted by the department, were facts that were never investigated and brought to the... I get all that, but never mind. I'm done. Did you get an answer? Yes. Okay. Thank you. We thank you for your argument. We thank you both. The case will be submitted. Would the clerk call the next case, please? Thank you.